**Ronald Kenneth NEAL, Plaintiff,**

v.

**Correctional Officer Phillip MILLER, Defendant.**

No. G87–467 CA.

United States District Court, W.D. Michigan, S.D.

Oct. 4, 1991.

Richard E. Holmes of Smith, Haughey, Rice & Roegge, Grand Rapids, Mich., for plaintiff.

Daniel L. Elve of Rhoades, McKee, Boer, Goodrich & Titta, Grand Rapids, Mich., for defendant.

## ORDER APPROVING MAGISTRATE'S REPORT AND RECOMMENDATION

HILLMAN, Senior District Judge.

The court has reviewed the Report and Recommendation filed by the United States Magistrate in this action. The Report and Recommendation was duly served on the parties, and no objection has been made thereto within the time required by law. Therefore,

IT IS ORDERED that the Report and Recommendation of the Magistrate is approved and adopted as the opinion of the court.

Plaintiff's claims under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment are dismissed. Judgment is entered in favor of plaintiff and against defendant on plaintiff's pendent common-law battery claim in the amount of Seven Hundred Fifty Dollars ($750.00), plus statutory interest and costs as allowed by law.

## REPORT AND RECOMMENDATION

JOSEPH G. SCOVILLE, United States Magistrate Judge.

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The case arises from a physical assault upon plaintiff by defendant Philip Miller, a correctional officer. The assault occurred on January 6, 1987, in the Ionia Maximum Correctional Facility (IMCF), where plaintiff was incarcerated pursuant to a state criminal conviction.

By opinion and order entered on February 22, 1990, Judge Douglas W. Hillman denied both parties' motions for summary judgment, finding the existence of genuine issues of material fact. On May 22, 1990, Judge Hillman denied defendant's motion for reconsideration. In September of 1990, Judge Hillman appointed counsel for plaintiff. On December 6, 1990, Judge Hillman referred the matter to me for evidentiary hearing pursuant to 28 U.S.C. § 636(b)(1)(B). *See McCarthy v. Bronson,* — U.S. ——, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991).

The parties appeared before me on May 2, 1991, for an evidentiary hearing. Plaintiff was represented by Richard E. Holmes, Esq. Defendant was represented by Daniel L. Elve, Esq. Plaintiff presented the testimony of defendant Philip Miller (called as an adverse witness), Sgt. Jeffrey Huff, Officer William C. Tellas, Tom Vogel, and plaintiff himself. Defense counsel cross-examined the witnesses called by plaintiff. Plaintiff offered the depositions of Dr. Benjamin Ulep and Officer Floyd Colin Battle as substantive evidence. Defendant of-

fered all depositions as substantive evidence. At the close of the hearing, I ruled upon objections to the proffered depositions and accepted all admissible portions of the depositions into evidence. I also received into evidence all proffered exhibits, except plaintiff's exhibits 4, 5, and 6.

On the basis of the record outlined above, I submit the following proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

### PROPOSED FINDINGS OF FACT

1. On January 6, 1987, plaintiff Ronald Kenneth Neal was approximately twenty-four years old. At that time, he was incarcerated at IMCF on a state felony conviction. Plaintiff was housed in Unit J–5 of IMCF.

2. In January of 1987, defendant Philip Miller was employed as a correctional officer at IMCF. At all times relevant to this case, defendant was acting under color of state law. Defendant was assigned to Unit J–4, which was not the unit in which plaintiff was housed. Plaintiff and defendant, however, knew each other from previous contacts in the prison. The record does not indicate any ill will or animosity between plaintiff and defendant before January 6, 1987.

3. At approximately 4:00 p.m. on January 6, 1987, plaintiff accidentally bumped into defendant, causing defendant to spill coffee on himself. Defendant did not believe that the contact was purposeful, and he harbored no ill will as a result of the accidental contact. Because of what he regarded as a friendly relationship with plaintiff, however, defendant decided to "play a trick" on plaintiff in response to this incident.

4. Later in the afternoon of January 6, defendant went to plaintiff's unit (J–5), apparently for the purpose of initiating contact with plaintiff. Defendant, in the presence of fellow officer William C. Tellas (who was assigned to Unit J–5), gained plaintiff's attention by calling out to him "What's up, Shot?"

5. Defendant then engaged in the conduct that forms the basis for this case. Defendant raised his left hand in the air and asked plaintiff, "What do you see here?" Plaintiff said, "Nothing." Defendant then pointed to his elbow and asked, "What do you see here?" Plaintiff responded, "Nothing." Defendant then struck plaintiff in the groin area, saying, "Well, there's nothing here either."

6. The manner and force of the blow to plaintiff's groin was the subject of sharp disagreement at the hearing. Defendant contended that he delivered a light, backhand blow with an open hand, striking plaintiff in the thigh. He testified that the purpose of the "joke" was to startle, not injure. He claims the blow was delivered with his left hand, and that plaintiff did not double over or exhibit any other indication of serious pain. Plaintiff, by contrast, contends that the blow was delivered by plaintiff's right hand, formed into a fist, that the blow was an upward-arcing uppercut delivered with great force and that he was struck in the genitals. He claims to have doubled over immediately in pain.

7. The testimony of the only eyewitness, Officer William Tellas, contradicts both of the parties' version to some extent. At the time of the incident, Officer Tellas was assigned to Unit J–5, the scene of the incident. Officer Miller related that he and defendant were talking, when plaintiff came up the stairs from the yard. Defendant called plaintiff over, asking whether plaintiff wanted to see "a joke." From a distance of approximately five feet, Tellas observed the "joke," as described above. According to Tellas's testimony, the "joke" ended with defendant striking plaintiff in the groin. In a contemporaneous memorandum to his superior (Plf. Ex. 2), Tellas described the blow as being delivered with a "fist." The memorandum also stated that the blow was "hard enough that Neal doubled over from the blow." A memo prepared by his superior, Sgt. Huff, quotes Tellas as saying the blow was "extremely hard" (Plf. Ex. 3).

8. I resolve the discrepancies as follows. First, I find that the blow was di-

rected to the groin area, not to the leg. Second, the blow was delivered with a loosely closed fist. This conclusion is supported by the testimony of Officer Tellas, who explained that his reference to a fist in plaintiff's exhibit 2 was meant to convey a loose fist. Third, the blow was not delivered in the arcing, uppercut manner described and demonstrated by plaintiff. If plaintiff were to be believed, defendant bent his knees, took deliberate aim, and delivered a vicious uppercut to the groin. In light of plaintiff's youth and excellent physical condition, he would have instinctively moved away or otherwise avoided such an obvious, deliberate attack. Plaintiff's dramatic description of the manner in which the blow was delivered is incredible and appears to be an exaggeration designed to maximize the consequences of this incident. I find that the blow was delivered in a backhand manner, hard enough to cause plaintiff to double over slightly. Sgt. Huff's statement that the blow was "extremely hard" was his version of Tellas's statement and is not supported by firsthand observation.

9. Defendant struck plaintiff intentionally, without consent, and without provocation. Defendant intended to strike plaintiff but did not intend to injure him. The situation did not call for the application of any force by defendant, nor was there any other penological justification for the blow. Defendant's state of mind is more accurately described as playful or mischievous rather than wanton or malicious. This conclusion is supported by the testimony of witnesses Tellas, Choka, and Miller, all of whom describe the previous relationship between plaintiff and defendant as joking or friendly rather than antagonistic.

10. Immediately after the incident, Officer Tellas directed plaintiff to return to his cell. Plaintiff appeared to be able to walk to the cell without difficulty. The next day, plaintiff reported to sick call, complaining of pain as a result of the blow. Plaintiff's medical records (Joint Ex. 1A) confirm that he was seen on the afternoon of January 7 by Dr. Fowler, who noted no symptoms of significant injury. Dr. Fowler saw plaintiff the next day and again noted no significant physical findings to indicate serious injury. As a result, Dr. Fowler refused to issue a medical "lay-in" (excuse from work) noting "no need for lay-in." On the next day, however, another employee of the health service saw plaintiff and issued him a two-week lay-in for reasons that are undisclosed by the present record.

11. The medical records indicate that plaintiff returned to the medical department frequently complaining of tenderness, pain, and cramping in his groin. The deposition of Dr. E. William Fowler, however, states that plaintiff never exhibited "any sign of injury" (Dep. p. 3). A urinalysis disclosed only a heightened white blood count, which is consistent with infection and not injury. Subsequent examinations likewise failed to demonstrate any injury, despite plaintiff's complaints. By June 18, 1987, the doctor had not observed "any objective medical injury involving the groin area." Earlier notes by the physician's assistant (4/23/87, 5/20/87) reflect the conclusion that plaintiff's claims of pain were an abuse of the sick call.

12. On October 1, 1987, plaintiff was transferred to Marquette Branch Prison (MBP). By that time, he had been seen on numerous occasions by medical personnel at IMCF and had undergone diagnostic tests in response to his complaints of pain. The prison medical personnel were unable to find any evidence of injury before the date of transfer (Dep., p. 17). After arriving at MBP, plaintiff was cleared by a physician for general participation in sports with no restrictions (Joint Ex. 1A, 10/28/87).

13. While incarcerated in MBP, plaintiff was seen by Dr. Benjamin Ulep, a prison physician, on several occasions, the first being December 13, 1988. Plaintiff presented Dr. Ulep with "numerous, repeated, vague complaints of lower abdominal, groin, and genitalia pains." (Dep., p. 5). Dr. Ulep diagnosed the condition as chronic inguinal strain. (*Id.*) Dr. Ulep testified that a blow struck with great force to the groin could predispose a person to develop such a strain. (*Id.*, p. 7). Dr. Ulep

admitted, however, that he was unable to say whether a blow to the groin almost two years previously did result in the inguinal strain. (*Id.*, p. 11). A number of other causes are possible, including heavy lifting, pushing or shoving heavy objects, or strains from playing sports. (*Id.*, pp. 11–13). As plaintiff's job in the prison laundry required him to move loads of up to 1,500 pounds, exertional strain is a more likely cause of the 1988 injury.

14. On the record before me, I find that plaintiff sustained no significant injury as a result of defendant's blow and that his complaints of persistent pain were an exaggerated response designed to capitalize on defendant's conduct. Plaintiff's pain and suffering was limited to a brief period on the day of the incident. This conclusion is supported by the lack of any medical evidence of injury for many months following the incident. It is also supported by the testimony of inmate Choka, who testified that plaintiff was interested in finding the occasion for a lawsuit before this incident occurred. It is also corroborated by the testimony of Officer Tellas, who said that plaintiff offered him money if Tellas would support his version of the events. Dr. Ulep summed up the situation when he testified, "He [plaintiff] may have suffered some kind of an injury but the extent of his pain and his complaints are just too out of proportion to what we have found." (Dep., p. 19).

## DISCUSSION

### I. LIABILITY

Plaintiff advances three theories of liability: common-law battery, cruel and unusual punishment in violation of the Eighth Amendment, and deprivation of liberty without due process of law in violation of the Fourteenth Amendment. I will discuss each theory of liability in turn.

#### A. *Common–Law Battery*

■ Plaintiff brings a pendent claim for common-law battery under Michigan law. Under the tort law of this state, a battery is a willful or intentional touching of a person against his will. *Tinkler v. Richt-*er, 295 Mich. 396, 295 N.W. 201, 203 (1940). Battery is an intentional tort. That is, the actor must touch the victim intentionally. Intent to do harm is not required, however. *See Mitchell v. Daly*, 133 Mich.App. 414, 350 N.W.2d 772, 778–79 (1984).

■ Plaintiff has proved by a preponderance of the evidence all the elements necessary to establish a common-law battery under Michigan tort law. Defendant hit plaintiff intentionally. The contact was done without provocation and without plaintiff's consent. The touching was not privileged. Accordingly, plaintiff should recover damages for common-law battery, as discussed in part II below.

#### B. *Eighth Amendment*

Plaintiff asserts a claim pursuant to 42 U.S.C. § 1983 for violation of his rights under the Eighth Amendment. As a prisoner incarcerated under a criminal conviction, plaintiff's principal substantive rights are guaranteed by the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See Ingraham v. Wright*, 430 U.S. 651, 664, 97 S.Ct. 1401, 1408, 51 L.Ed.2d 711 (1977). The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of crime. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981); *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). The Eighth Amendment therefore prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir.1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399). The Eighth Amendment also requires the states to provide prisoners with the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399; *accord*, *Bellamy v. Bradley*, 729 F.2d 416, 420 (6th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984). The Eighth Amendment is concerned only with "deprivations of essential food, medical care, or

sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348, 101 S.Ct. at 2400. The federal courts may not intervene to remedy conditions that are merely unpleasant or undesirable.

The conduct of defendant at issue in this case was obviously not part of the punishment prescribed for plaintiff's crimes by Michigan law or the sentencing court. The Supreme Court has recently clarified the components of an Eighth Amendment claim arising from deprivations that "were not specifically part of the sentence but were suffered during imprisonment." *Wilson v. Seiter*, —— U.S. ——, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991). The *Wilson* Court, reviewing Supreme Court precedents in this area, explained that such Eighth Amendment claims have both an objective and a subjective component. Under *Wilson*, a prisoner claiming cruel and unusual punishment must establish both that the deprivation was sufficiently serious to rise to constitutional levels (the objective component) and that the state official acted with a sufficiently culpable state of mind (the subjective component). *Id.*, 111 S.Ct. at 2324.

In *Wilson*, the Supreme Court pointed to its decision in *Rhodes* as establishing the contours of the objective component of an Eighth Amendment violation. *Rhodes* involved a challenge to the prison practice of "double bunking." As the *Wilson* court explained, *Rhodes* rejected an Eighth Amendment challenge to this practice, because the deprivation was not "sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 111 S.Ct. at 2324.

With regard to the subjective, or "state of mind" component, the Court relied upon its precedents requiring the "unnecessary and *wanton* infliction of pain." *Wilson*, 111 S.Ct. at 2323 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)). Although wantonness is the required state of mind, the meaning of "wantonness" must be determined "with due regard for the differences in the kind of conduct against which an Eighth

Amendment objection is lodged." *Wilson*, 111 S.Ct. at 2326 (quoting *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986)). In emergency situations, wantonness consists of acting "maliciously and sadistically for the very purpose of causing harm." *Wilson*, 111 S.Ct. at 2326. In nonemergency situations, "deliberate indifference" constitutes wantonness. *Id.*

■ Applying the teaching of *Wilson* to the facts of this case, I find that plaintiff has not proved by a preponderance of the evidence either the objective or the subjective component of an Eighth Amendment violation. In order to meet the objective component of an Eighth Amendment claim, the deprivation must be sufficiently "grave" or "serious." *Wilson*, 111 S.Ct. at 2324. In prison cases involving the excessive use of force, the federal courts have long recognized this objective component by holding that an Eighth Amendment claim must involve more than a simple assault and battery under state law. *See, e.g., Parrish v. Johnson*, 800 F.2d 600, 604–05 (6th Cir.1986); *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied, sub nom. Employee–Officer John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). To be actionable under the Eighth Amendment, therefore, the alleged excessive use of force must somehow rise to "constitutional dimensions." *See Hurd v. Nolan*, 610 F.Supp. 591, 592 (E.D.Mo. 1985) (citing cases). In drawing the distinction between a common-law battery on the one hand and an Eighth Amendment violation on the other, federal courts have routinely held that a single push, shove, punch, or blow by a prison guard simply does not rise to constitutional dimensions. *See, e.g., Hudson v. McMillian*, 929 F.2d 1014 (5th Cir.1990) (no Eighth Amendment violation where guard punched prisoner in mouth, eyes, chest, and stomach), *cert. granted*, —— U.S. ——, 111 S.Ct. 1579, 113 L.Ed.2d 645 (1991); *Hines v. Boothe*, 841 F.2d 623 (5th Cir.1988) (inmate pushed and kicked by guard in prison hallway); *Black Spotted Horse v. Else*, 767 F.2d 516 (8th Cir.1985) (guard shoved prisoner and poked him in the back); *Caudle–El v. Peters*, 727

F.Supp. 1175 (N.D.Ill.1989) (scuffle between guards and prisoner); *Hurd*, 610 F.Supp. at 592 (single punch by guard). Those cases finding Eighth Amendment violations have involved far more serious deprivations. *See, e.g., McHenry v. Chadwick*, 896 F.2d 184 (6th Cir.1990) (beating of prisoner by several officers using leather gloves and billy clubs); *Gaut v. Sunn*, 810 F.2d 923 (9th Cir.1987) (inmate beaten while handcuffed); *Parrish v. Johnson*, 800 F.2d at 604–05 (prison medical official wielding a knife); *Grillo v. Sielaff*, 414 F.Supp. 272 (N.D.Ill.1976) (inmate punched, kicked, hit with cloth-wrapped object and slammed into a steel door as a battering ram while wearing a restraining belt).

*Wilson* has now authoritatively confirmed the validity of this line of cases. Regardless of the prison guard's state of mind, the deprivation visited upon a prisoner must be "sufficiently grave" before the Eighth Amendment can be invoked. 111 S.Ct. at 2324. It is true that the Sixth Circuit does not require a significant or severe injury as an element of an Eighth Amendment violation. *See McHenry v. Chadwick*, 896 F.2d at 187.[1] The severity of the deprivation, however, presents a separate issue from the severity of any ensuing injury. Reading *Wilson* and *Chadwick* together leads to the conclusion that the deprivation must be serious, although it need not necessarily lead to a serious injury.

Applying the objective component identified by *Wilson*, I conclude that the deprivation involved in the present case is not serious enough to rise to constitutional dimensions. Defendant delivered a backhand blow with a loosely balled fist. Officer Tellas described the blow as more like "a slap" than a punch. Although the blow was delivered with enough force to double plaintiff over, I note that even a slight blow delivered to this area can have that effect. The blow did not result in any injury that could be documented by the prison medical staff. Although defen-

dant's conduct was adolescent and inappropriate to a professional prison officer, it cannot be described as "cruel and unusual" under any reasonable definition of those words. Defendant's prank, far from being "unusual," is familiar to any male who has spent any time in a high-school locker room, college dormitory, or military barracks. This case falls within the line of cases cited above that refuse to find an Eighth Amendment violation arising from a single, isolated blow. In sum, defendant's conduct is not serious or grave enough to satisfy the objective component of the Eighth Amendment under *Wilson*.

■ In addition to an objective component, the Eighth Amendment requires that the state actor possess a certain subjective state of mind. Where, as here, the actor is not in an emergency situation, the requisite state of mind is "deliberate indifference." *Wilson*, 111 S.Ct. at 2326. In determining the existence of the requisite subjective intent, the court should examine the circumstances surrounding the application of force, including such factors as the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of the injury inflicted. *Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085.

Plaintiff argues that application of this test results in a finding in his favor, since there was obviously no need to apply force and the force was, for that reason, in excess of that needed. This analysis confuses the intermediate steps of the test with the ultimate finding necessary for liability. As the Supreme Court has made clear, the foregoing factors should be analyzed to determine whether the state actor has "evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085. Defendant had no intent to inflict harm, nor did his conduct evince such wantonness with respect to the unjustified in-

---

1. The Supreme Court has granted *certiorari* to resolve the question whether a significant injury is an element of an Eighth Amendment claim. *Hudson v. McMillian*, —— U.S. ——, 111 S.Ct. 1579, 113 L.Ed.2d 645 (1991). Until the issue is resolved by the Supreme Court, *Chadwick* is binding on the district courts in this circuit.

fliction of harm that it can be viewed as tantamount to a knowing willingness that harm occur. As explained by the Supreme Court, deliberate indifference implies "an act so dangerous that the defendant's knowledge of the risk can be inferred." *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (quoting *Duckworth v. Franzen,* 780 F.2d 645, 652 (7th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986)). Simply put, the facts do not demonstrate that defendant harbored the requisite wanton state of mind necessary for an Eighth Amendment violation.

For the foregoing reasons, I recommend that plaintiff's Eighth Amendment claim be dismissed on its merits.

## C. *Fourteenth Amendment Due Process*

Plaintiff also asserts a section 1983 claim for violation of his right to due process of law under the Fourteenth Amendment. Plaintiff's brief asserts both substantive and procedural theories of due process. Neither aspect of plaintiff's due-process claim bears scrutiny.

### 1. Substantive Due Process

Relying on an earlier Sixth Circuit case, plaintiff asserts a substantive due-process claim for the excessive use of force. *Franklin v. Aycock,* 795 F.2d 1253 (6th Cir.1986). The Supreme Court's later opinion in *Whitley,* however, held that the Eighth Amendment is the principal source of rights against the wanton infliction of pain and that the Due Process Clause affords prisoners no greater rights in this area than does the Eighth Amendment. 475 U.S. at 327, 106 S.Ct. at 1088. The Supreme Court has since reiterated this view in *Graham v. Connor,* 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989) (any protection afforded by substantive due process to convicted prisoners is "at best redundant of that provided by the Eighth Amendment."). Since that time, the Sixth Circuit has also squarely held that a convicted prisoner's section 1983 claim for excessive use of force must be analyzed under the Eighth Amendment, and not under principles of substantive due process. *Walker v. Norris,* 917 F.2d 1449, 1455 (6th Cir.1990).

Under these authorities, plaintiff's claim arises under the Eighth Amendment, and not under principles of substantive due process. His substantive due-process theory should therefore be rejected.

### 2. Procedural Due Process

Plaintiff asserts a section 1983 claim for violation of procedural due process, arguing that his procedural rights were violated when defendant struck him without a previous hearing. As a matter of logic, it seems fatuous to require the State to provide a hearing before a prison guard can engage in a physical attack that obviously violates state law and that no hearing officer would ever authorize.

The Supreme Court authoritatively dealt with this issue in the landmark case of *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (*overruled in part, not relevant here, by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). In *Parratt,* an inmate claimed that he was deprived of property without due process of law when prison officials lost a set of his hobby materials, valued at $23.50. The Court held that a deprivation of property, resulting from random and unauthorized conduct of a state actor, does not give rise to a procedural due-process claim so long as the state provides an adequate post-deprivation remedy to address the loss. 451 U.S. at 543, 101 S.Ct. at 1916–17. The moving principle of *Parratt* is the uselessness of requiring states to provide a pre-deprivation hearing to persons subjected to random and unauthorized acts of state officials. Since the state official is acting in an unauthorized way, the state simply cannot foresee the deprivation and provide a predeprivation hearing. Therefore, if an adequate post-deprivation remedy exists to remedy the random, unforeseeable conduct, the deprivation is not "without due process of law." 451 U.S. at 537, 101 S.Ct. at 1914. The *Parratt* rule applies to both negligent and intentional deprivations, *see Hudson v. Palmer,* 468 U.S. 517, 530–36, 104 S.Ct. 3194, 3202–05, 82 L.Ed.2d 393 (1984), and applies to deprivations of liberty as well as property, *see Zinermon v. Burch,* 494 U.S.

113, 110 S.Ct. 975, 986–87, 108 L.Ed.2d 100 (1990); *Watts v. Burkhart*, 854 F.2d 839, 843 (6th Cir.1988).

The threshold issue in any case involving *Parratt* is whether the deprivation was caused by a "random and unauthorized act" on the one hand or pursuant to an established state procedure on the other hand. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). In *Logan*, the Court upheld a procedural due-process claim where the operation and application of the state statutory scheme, and not the random act of a state official, resulted in the destruction of plaintiff's property interest. 455 U.S. at 435–36, 102 S.Ct. at 1157–58; *accord, Brotherton v. Cleveland*, 923 F.2d 477, 482 (6th Cir.1991) (removal of deceased's corneas was pursuant to established state procedure and necessitated predeprivation process). In the present case, it is clear beyond doubt that defendant's assault upon plaintiff was a random and unauthorized act and was not done pursuant to any state procedure. As discussed above, the assault was contrary to state tort law. More to the point, defendant's conduct was directly contrary to the "hands-off policy" promulgated by the Department of Corrections to govern the conduct of prison officials. That policy, contained in the Department of Corrections employee handbook, provides:

  10. Hands–Off Policy.

  Laying hands on another person, or other types of bodily contact, is offensive to most and is not permitted except as required for necessary control.

(Employee Handbook, Plf. Ex. 8, p. 21). The employee handbook goes on to prohibit the use of force against prisoners unless the guard is acting in defense of himself or another or when necessary to prevent escape or maintain order. The policy "strictly prohibits" offensive blows with the extremities, such as hitting and kicking motions, "unless the employee can clearly show that such blows were necessary to prevent serious injury to staff or another resident." (*Id.* at p. 22). In light of these provisions, defendant's conduct was directly contrary to established policy. This case therefore presents a random and unauthorized act, not sanctioned by any established state policy. *See GM Engineers and Assoc. v. West Bloomfield Twp.*, 922 F.2d 328, 331–32 (6th Cir.1990) (where state law circumscribes discretion of state officials, contrary conduct is unauthorized, and claim is subject to *Parratt* doctrine). By the very nature of unlawful, assaultive conduct, it is impossible for the state to predict the deprivation and provide a predeprivation hearing. *See Zinermon*, 110 S.Ct. at 985.

■ Plaintiffs who assert procedural due-process claims premised upon unauthorized acts of state officials must plead and prove the inadequacy of state post-conviction remedies, including common law tort remedies. *See GM Engineers*, 922 F.2d at 331–32; *Vicory v. Walton*, 721 F.2d 1062, 1066 (6th Cir.1983), *cert. denied*, 469 U.S. 834, 105 S.Ct. 125, 83 L.Ed.2d 67 (1984). Plaintiff has not and cannot meet this burden. Michigan law provides effective remedies for assaults on prisoners. As shown above, Michigan provides a common-law tort remedy for damages incurred as the result of an offensive, unconsented touching. Accordingly, the doctrine of *Parratt v. Taylor* bars plaintiff's procedural due-process claim, which should be dismissed on its merits.

## II. DAMAGES

Having found the existence of a battery under state law, I turn to the issue of damages. Under Michigan law, a tort victim is entitled to a fair and adequate award of damages to compensate for all physical and mental harm proximately caused by the tortfeasor's actions. SJI2d 50.01; *Sutter v. Biggs*, 377 Mich. 80, 139 N.W.2d 684, 686 (1965). In the present case, plaintiff seeks compensation for lost wages accruing during the two-week period in which he was absent from work ("laid in") after the assault. He also claims compensatory and punitive damages for personal injury, which plaintiff claims lasted for a period of years after the assault. I will assess each claim in turn.

■ On the present record, I find that plaintiff has not borne his burden of showing that his two-week absence from work was proximately caused by the assault. Dr. Fowler, a prison doctor, saw plaintiff on January 7, 1987, the day after the assault. (Dep., p. 10). After an examination, the doctor found no signs of any significant injury, and urinalysis failed to show any blood in the urine. (*Id.*, pp. 11–13). As a result, Dr. Fowler did not place plaintiff on any physical restrictions and did not order any medical lay-in. (*Id.*, p. 14). Plaintiff returned to the clinic the next day, January 8, and again asked for a lay-in. Dr. Fowler reexamined plaintiff, again determined that plaintiff was suffering from no injury, and refused a medical lay-in. (*Id.*, p. 14). Dr. Fowler's contemporaneous notes confirm his testimony. (Joint Ex. 1A, Entry of 1/8/87). Dr. Fowler's notes indicate that plaintiff wanted a lay-in but noted "normal genitalia"; "no swelling" of the testicles; epididymis "not swollen." The doctor noted no physical findings to indicate serious injury and "no need for lay-in."

The medical records indicate, however, that plaintiff saw another employee of the health service the next day, January 9, 1987. The visit was apparently for purposes of the urinalysis ("U.A.") ordered by Dr. Fowler the previous day. The note concludes with an order for a two-week lay-in. (Joint Ex. 1A, Entry of 1/9/87).

In summary, the record shows that plaintiff was laid in for a two-week period, but does not show that the lay-in was the proximate result of defendant's assault. Dr. Fowler, the medical doctor who examined plaintiff shortly after the assault, found no indication of an injury that would justify a medical lay-in. The lay-in was ordered by another medical employee, after plaintiff's urinalysis. As noted above, Dr. Fowler testified that the urinalysis was inconsistent with any physical injury but showed the presence of an infection unrelated to any physical blow. Plaintiff has provided no testimony from the medical employee who ordered the lay-in. Plaintiff's position appears to be based upon pure speculation: Since the lay-in was ordered two days after the assault, it must have been caused by it.

The causal connection between defendant's misconduct and the claimed injury must be established by proof, not speculation. *See Glinski v. Szylling*, 358 Mich. 182, 99 N.W.2d 637, 645 (1959). The medical evidence here shows no causal connection. Plaintiff presented no proof that the lay-in was ordered because of the alleged groin injury. I therefore find that plaintiff has not sustained his burden of showing that the assault was a cause-in-fact of the medical lay-in.

■ Plaintiff is entitled to compensation for the battery and resulting pain and suffering. The evidence showed that the blow to plaintiff's groin was delivered with sufficient force to double him over. Plaintiff's contention that the blow caused a permanent injury is not sustained by the medical records. His claim that the inguinal strain diagnosed years later by Dr. Ulep was somehow causally connected to the assault is not sustained by the medical records, especially Dr. Ulep's testimony. The evidence indicates that such an injury was more likely caused by an exertional strain, a distinct possibility in light of plaintiff's strenuous job duties in the prison laundry and his participation in sports. I find that the physical consequences of the battery lasted only for a short time on the day of the attack. In light of the medical evidence, plaintiff's claims of pain, disablement, and permanent injury after the day of the battery are unsubstantiated. An award of $500.00 for the battery should be adequate to compensate plaintiff for the pain, suffering, and other physical consequences of the battery.

■ In addition, plaintiff seeks an award of punitive damages. Michigan law, however, does not allow the imposition of damages designed solely to punish or to make an example of the defendant. *See Kewin v. Massachusetts Mut. Life Ins. Co.*, 409 Mich. 401, 295 N.W.2d 50, 55 (1980). Michigan law does allow the imposition of "exemplary" damages, which serve a purely compensatory function. Exemplary damages are awarded to compensate for the humiliation, sense of outrage,

and indignity resulting from injuries willfully inflicted. *Id.*, 295 N.W.2d at 55. The Michigan Supreme Court has held that exemplary damages are a type of mental anguish damages, so that a plaintiff is not entitled to an award of both exemplary damages and damages for mental anguish or suffering. *See Veselenak v. Smith,* 414 Mich. 567, 327 N.W.2d 261 (1982). Exemplary damages are recoverable for an assault and battery. *See Kewin,* 295 N.W.2d at 55.

█ The facts adduced at the hearing support an award to plaintiff of exemplary damages designed to compensate him for the humiliation, indignity, and sense of outrage resulting from the battery. I credit plaintiff's testimony that he was angry as a result of the battery. Because of his status as a prisoner, plaintiff was unable to retaliate in any way, but was forced to submit to the indignity passively, which he did. The restraints placed upon plaintiff's ability to retaliate as a result of his status as a prisoner certainly heightened the sense of outrage and humiliation over that which would have been experienced by a free citizen. In the circumstances, I conclude that an additional award of $250.00 in exemplary damages would reasonably compensate plaintiff for injury to his feelings.

## CONCLUSION

For the foregoing reasons, I recommend that plaintiff's claims under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment be dismissed on their merits. I recommend that judgment be entered on plaintiff's behalf in the amount of $750.00 on the pendent common-law battery claim, with statutory interest as allowed by law, and an award of costs.

Dated: September 5, 1991.

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b). All objections and responses to objections are governed by W.D.Mich.L.R. 13(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters,* 638 F.2d 947 (6th Cir.1981); *see Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).